THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ERICA MILLER, individually and as guardian for minor child I.M.,

Plaintiff,

v.

MONROE SCHOOL DISTRICT, *et al.*,

Defendants.

CASE NO. C14-1946-JCC

ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on the motions for summary judgment by Defendants individual Board members (Dkt. No. 65) and Defendants District, Board, and individual District employees (Dkt. No. 73). Having thoroughly considered the parties' briefing and the relevant record, the Court hereby GRANTS in full the individual Board members' motion (Dkt. No. 65) and GRANTS in part and DENIES in part the motion by the District, Board, and individual District employees (Dkt. No. 73) for the reasons explained herein.

I.   **BACKGROUND**

Many of the facts in this case are disputed. The following are the facts viewed in a light most favorable to Plaintiff, as is appropriate on summary judgment review. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986).

I.M. was diagnosed with autism at the age of five. (Dkt. No. 1 at 8.) At the time of the events relevant to this case, I.M. was eight years old and a third grade Monroe School District

student. (*See* Dkt. No. 90-1 at 2, 4; Dkt. No. 90-3 at 2.) To address I.M.'s disability, a multidisciplinary team—including various school employees and I.M.'s mother, Erica Miller—created an individualized education plan (IEP), an aversive intervention plan (AIP), and a behavior intervention plan (BIP) (collectively referred to as "the Plans"). (*See* Dkt. No. 90-1 at 2, 4.) The Plans created in May 2013 were in effect when the present conflict began. (*See* Dkt. No. 76 at 3.)

I.M.'s May 2013 Plans described when, how, and which aversive interventions may be performed. (Dkt. No. 90-1 at 2, 5.) Aversive interventions are "the systematic use of stimuli or other treatment which a student is known to find unpleasant for the purpose of discouraging undesirable behavior on the part of the student." (Dkt. No. 90-1 at 2.) Under I.M.'s AIP, aversive interventions could be utilized "if I.M. becomes unsafe to himself or others." (Dkt. No. 90-1 at 2.) The AIP permitted three kinds of aversive interventions: time out, seclusion, and Right Response techniques for physical management. (Dkt. No. 90-1 at 2.) Time outs could last a maximum of five minutes; seclusions could last up to 20 minutes. (Dkt. No. 90-1 at 2.) The use of aversive interventions was limited to "Right Response trained individuals." (Dkt. No. 90-1 at 3.) Right Response training is a four-day, 14-hour course designed to teach staff how to respond to escalating unsafe behaviors and how to implement physical safety techniques and interventions. (Dkt. No. 90-3 at 18, 22.) The course was required for school staff members who worked with special education students with AIPs. (Dkt. No. 90-3 at 22.)

I.M.'s BIP also set forth "crisis management strategies" that were to be utilized when I.M. exhibited unsafe behavior. (Dkt. No. 90-1 at 5.) The strategies grew progressively more severe if the previous step was unsuccessful: first, asking I.M. to take a time out at his desk with his head down; then, asking I.M. to take a time out in a more secluded area of the classroom; next, asking I.M. to take a time out in the seclusion room with the door open and an adult in the doorway; and, finally, closing the door to the seclusion room and monitoring I.M. through the window. (Dkt. No. 90-1 at 5.)

In September 2013, I.M. began third grade at Chain Lake Elementary School. (Dkt. No. 76 at 1, 3.) His teacher was Melissa Hart, who was trained in special education. (Dkt. No. 76 at 1-2.) Hart was hired six days before she began teaching and was not able to participate in the Right Response training prior to becoming I.M.'s teacher. (Dkt. No. 76 at 2.) During the course of Hart's interview, she was not asked whether she had Right Response training. (C15-1323, Dkt. No. 30-2 at 732.) Hart was provided an overview of the Right Response training at the end of the first day of school. (Dkt. No. 76 at 2-3.) She did not complete the Right Response course until October 2013, after I.M. left Chain Lake. (*See* Dkt. No. 76 at 3.)

I.M. attended Chain Lake for six days, during which he was subjected to aversive interventions on 10 occasions. (Dkt. No. 76 at 3, 5.) The aversive interventions were as follows:

<u>September 4 at 9:45 a.m.</u>: When I.M. was asked to write his name, he became aggressive towards Hart, hitting and kicking her. He was taken to the quiet room in a two-person escort by Hart and paraeducator Vanessa Ostler. He remained in the quiet room for five minutes. The entire time he was in the quiet room, an adult was outside the door and could see I.M. through the window in the door. (*See* Dkt. No. 90-3 at 2; Dkt. No. 76 at 5-6.)

<u>September 4 at 12:40 p.m.</u>: I.M. attempted to play with a gaming device. When asked to put it away, he became physically and verbally aggressive towards Hart and his fellow students. He was taken by a two-person escort to the quiet room. He remained there for two five-minute periods. An adult was outside the door and could see and hear I.M. through the window throughout the seclusion. (*See* Dkt. No. 90-3 at 3; Dkt. No. 76 at 6-7.)

<u>September 4 at 3:20 p.m.</u>: I.M. became frustrated at another student and pushed the student into a wall. He was taken to the quiet room in a two-person escort by Hart and Ostler. I.M. remained in the quiet room for five minutes. An adult was outside the door and could see and hear I.M. throughout the seclusion. (*See* Dkt. No. 90-3 at 4; Dkt. No. 76 at 7.)

I.M. came home after school on September 4 with feces in his pants. (Dkt. No. 90-6 at 3.)

<u>September 5 at 9:13 a.m.</u>: When asked to write his name, I.M. lashed out at Hart.

ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 3

Paraeducator Brennan escorted I.M. to the quiet room, where he remained for three five-minute periods. Brennan was outside the door and could see and hear I.M. throughout the seclusion. (*See* Dkt. No. 90-3 at 5; Dkt. No. 76 at 7-8.)

September 5 at 12:53 p.m.: While in music class, I.M. began disrupting and kicking his fellow students. I.M. then tried to leave the class and hit and kicked Ostler when she tried to stop him. Brennan put I.M. in a Right Response sitting hold to calm him down. (*See* Dkt. No. 90-3 at 6; Dkt. No. 78 at 5-6.)

September 5 at 1:57 p.m.: I.M. was asked to participate in a group activity, but did not want to do so. He kicked a classmate and was escorted to the quiet room where he remained for five minutes. An adult staff member could see and hear I.M. throughout the seclusion. (*See* Dkt. No. 90-3 at 8; Dkt. No. 76 at 8.)

September 6 at 9:32 a.m.: When I.M. was asked to sit safely in his chair, he pushed the chair at Hart, kicked her, and tried to hit her. Brennan escorted him to the quiet room, where he stayed for four minutes. Brennan observed him throughout the seclusion. (*See* Dkt. No. 90-3 at 9; Dkt. No. 76 at 8.)

September 6 at 12.45 p.m.: I.M. became annoyed at and punched another student. Brennan put her arms around I.M. from behind and I.M. bit Brennan. Hart and Brennan escorted I.M. to the quiet room where he remained for five minutes with Brennan watching him through the window. (*See* Dkt. No. 90-3 at 10; Dkt. No. 76 at 8-9.)

September 10 at 11:35 a.m.: I.M. was asked to stop disrupting music class. He stopped and took a deep breath, then ran out of the room. When Hart caught him and escorted him back, he kicked and punched her. Hart restrained I.M. on the floor in a hold, during which I.M. bit Hart's thumb. (*See* Dkt. No. 90-3 at 11; Dkt. No. 76 at 9.)

September 11 at 9:46 a.m.: I.M. became annoyed at and hit another student. He was escorted to the time out chair. When the chair hold did not work, he was put in a floor hold for three minutes. (*See* Dkt. No. 90-3 at 12; Dkt. No. 76 at 9.)

1    Miller observed the quiet room on September 11. (Dkt. No. 90-6 at 23.) On the wall, she

2    saw streaks of brown matter that she believed to be feces. (*See* Dkt. No. 90-6 at 24.) She also

3    saw streaks of "clear type fluid." (Dkt. No. 90-6 at 24.) Miller removed I.M. from school that

4    day. (*See* Dkt. No. 90-6 at 24.)

5    Miller requested an IEP meeting to address her concerns about the lack of compliance

6    with I.M.'s Plans, including her fear that aversive interventions were being overused. (*See* Dkt.

7    No. 74 at 7.) She asked that Lara Cole, Director of Student Services, attend the meeting. (Dkt.

8    No. 74 at 7.) Cole was unable to attend the September 16 meeting due to a scheduling conflict.

9    (Dkt. No. 74 at 7.) A second IEP meeting was held on September 19 with Cole in attendance.

10   (Dkt. No. 90-2 at 4.)

11   At the September 19 meeting, the District proposed an amended BIP and AIP. (Dkt. No.

12   74 at 8.) The amended Plans removed the Right Response training requirement. (Dkt. No. 74 at

13   8-9.) The amended Plans also expanded the situations in which aversive interventions would be

14   appropriate: both when I.M. posed a clear and present danger of serious harm to himself or

15   others, and also when he posed a serious harm to property or of seriously disrupting the learning

16   environment. (Dkt. No. 74 at 9.) Miller objected to this provision, seeking to remove aversive

17   interventions from the Plans entirely. (*See* Dkt. No. 74 at 9; Dkt. No. 90-4 at 6.) School staff

18   informed Miller why they believed aversive interventions were necessary. (Dkt. No. 74 at 9.)

19   The Plans were also amended to state that seclusions would occur in the front office and would

20   not exceed 20 minutes. (Dkt. No. 90-2 at 5.) After 20 minutes, Miller would be called and I.M.

21   would be given the opportunity to change locations and use the bathroom. (Dkt. No. 90-2 at 5.)

22   On September 20, Cole sent a copy of the amended Plans to Miller. (Dkt. No. 90-2 at 2.)

23   Miller responded that she did not agree that I.M. should be subjected to any aversive

24   interventions and requested that I.M. be removed from Hart's class. (Dkt. No. 90-4 at 6.) Miller

25   explained to Cole that the overuse of seclusion and other aversive interventions had damaging

26   emotional and physical effects on I.M. (Dkt. No. 90-4 at 6.) She asked that I.M. be transferred to

1   another classroom in the District. (Dkt. No. 90-4 at 6.)

2       Cole responded that the District believed I.M.'s current placement and Plans were

3   appropriate, but offered to hold another IEP meeting to discuss placement in other classes. (Dkt.

4   No. 90-3 at 30.) Cole informed Miller that she could also choose to register I.M. as a home

5   schooled student, enroll him in private school at Miller's own expense, or apply for an inter-

6   district transfer. (Dkt. No. 90-3 at 30.) Cole told Miller that, in the meantime, I.M. had accrued

7   four absences that had to be reported per state truancy guidelines. (Dkt. No. 90-3 at 30-31.)

8       Miller continued to seek alternative placement for I.M. (*See* Dkt. No. 90-5 at 32.) In

9   addition, she contacted Sound Options, a mediation service. (Dkt. No. 74 at 12.) Sound Options

10  notified Cole that Miller had requested mediation. (Dkt. No. 74 at 12.) Cole told Miller that she

11  would wait to schedule the IEP meeting until she spoke to Sound Options. (Dkt. No. 74 at 12.)

12  The parties mediated on October 9 but were unable to reach a resolution. (Dkt. No. 74 at 12.)

13      On October 14, Miller requested a meeting with Superintendent Kenneth Hoover. (*See*

14  Dkt. No. 90-5 at 32; Dkt. No. 74 at 12.) Hoover forwarded the request to Cole, who responded

15  that an IEP meeting would be scheduled as soon as possible. (Dkt. No. 90-5 at 32.)

16      On October 21, the District filed a truancy petition against Miller. (Dkt. No. 90-5 at 10-

17  13.) Miller received a copy of the petition along with a letter informing her that I.M. had been

18  automatically withdrawn from school due to his excessive absences. (Dkt. No. 90-5 at 9.)

19      On October 23, Miller left a letter at Hoover's office detailing the conflict over aversive

20  interventions and a draft of the citizen's complaint she intended to file. (*See* Dkt. No. 90-16 at

21  64-65.) Hoover passed the documents on to Cole. (Dkt. No. 90-16 at 65.)

22      On October 30, Miller filed a citizen's complaint with the Office of Superintendent of

23  Public Instruction (OSPI). (Dkt. No. 90-7 at 41.) The District was served with the complaint on

24  October 31. (Dkt. No. 90-7 at 41.) Hoover notified the Board about the citizen's complaint in

25  either October or early November. (*See* Dkt. No. 90-16 at 9-10, 20.)

26      On November 12, Sound Options facilitated an IEP meeting. (Dkt. No. 90-16 at 90; Dkt.

ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 6

No. 74 at 14.) The meeting resulted in the following amendments to the Plans: I.M. would be placed in a structured learning classroom at Salem Woods Elementary School; I.M. would have an aide three hours a day; a behavior intervention specialist would observe I.M. and convene another IEP meeting after 30 days at Salem Woods; and Right Response training was again required for individuals authorized to use escorts, holds, and isolations. (Dkt. No. 74 at 14.)

On November 18, Miller attended the truancy hearing. (Dkt. No. 90-5 at 5.) She testified that she did not feel safe returning I.M. to school based on what occurred at Chain Lake. (Dkt. No. 90-5 at 6.) On the parties' agreement, the court continued the hearing to January 14, 2014. (Dkt. No. 90-5 at 7.)

On November 19, I.M. started at Salem Woods. (Dkt. No. 77 at 2.) His teacher was Mairead Kinney. (Dkt. No. 77 at 2.) Kinney completed Right Response training in August 2013. (Dkt. No. 77 at 2.)  I.M. attended Salem Woods for five school days, during which he was subjected to aversive interventions three times. (Dkt. No. 77 at 2; Dkt. No. 90-3 at 13-16.) This included seclusion in a quiet room prepared by Salem Woods staff for I.M.'s arrival. (Dkt. No. 77 at 2-3.) The quiet room was not located in Salem Woods's front office, as the September 19 amendments to the Plans had required. (*See* Dkt. No. 77 at 3.)

The aversive interventions were as follows:

November 20 at 9:35 a.m.: I.M. was not carrying his chair safely. When asked to do so, he hit and kicked Kinney and paraeducator Trina Eriks. Kinney and Eriks took I.M. to the quiet room with a two-person hold. Kinney and Eriks remained in the quiet room with I.M. for 20 minutes. (*See* Dkt. No. 90-3 at 13; Dkt. No. 77 at 4.)

November 20 at 10:00 a.m.: Upon leaving the quiet room after the first aversive intervention, I.M. hit Kinney and tried to run away. Kinney and Eriks used a two-person hold to take him back to the quiet room. I.M. hit the walls and sustained scratches to his knuckles and a cut on the palm of his hand from hitting an intercom switch. I.M. eventually calmed down and returned to class. Kinney called the school nurse as soon as they returned, around 10:30 a.m.

Based on that timing, I.M.'s period in the quiet room exceeded the 20-minute limit. Upon I.M.'s return to class, the school nurse tended to his hand. Salem Woods Principal Janna Dmochowsky left Miller a phone message about the aversive interventions at 3:17 p.m. that day. (*See* Dkt. No. 90-3 at 13-15; Dkt. No. 77 at 4-5; *see also* C15-1323, Dkt. No. 30-2 at 614.)

November 21 at 12:50 p.m.: I.M. refused to wash his hands after lunch and began to hit and kick Kinney. Kinney and Eriks used a two-person hold and then a two-person escort to take I.M. to the quiet room. I.M. spent over 20 minutes in the quiet room. Dmochowsky called and left Miller a message the next day at 11:47 a.m. (*See* Dkt. No. 90-3 at 16; Dkt. No. 77 at 5.)

On the morning of November 26, I.M. refused to get on the school bus, saying that he was afraid to be put in seclusion. (Dkt. No. 74 at 15; *see also* C15-1323, Dkt. No. 30-2 at 261.) Miller emailed Cole that day and requested an emergency IEP meeting. (Dkt. No. 90-8 at 46.) Cole replied on December 2. (Dkt. No. 74 at 15.) She stated that an IEP meeting had just occurred, that I.M. had only been in school for five days, and that Dmochowsky felt the IEP was being properly followed. (Dkt. No. 74 at 15.) Cole disagreed that an emergency meeting was necessary and asked for Miller to identify the specific parts of the IEP she believed were not being followed and her basis for that belief. (Dkt. No. 74 at 15.) Cole reminded Miller that an IEP meeting was scheduled for 30 days after I.M.'s start at Salem Woods. (Dkt. No. 74 at 16.)

On December 3, Miller provided the District with a declaration of intent to provide home-based instruction. (Dkt. No. 74 at 16.) The District sent Miller a notice stating that the District would no longer provide educational services if I.M. was homeschooled and that Miller could contact the District if she wished to return I.M. to school. (Dkt. No. 74 at 16.)

On January 3, 2014, OSPI issued a decision on Miller's citizen complaint. (Dkt. No. 90-8 at 12.) OSPI found that the District did not properly follow I.M.'s Plans when he was at Chain Lake and did not show that the September 19 amendments to I.M.'s AIP were necessary. (Dkt. No. 90-8 at 29.) OSPI required the District to take student-specific corrective action if Miller chose to enroll I.M. in the District by March 3, 2014. (Dkt. No. 90-8 at 31.)

1      OSPI also required the District to take general corrective action, including development

2  of written guidance for all special education staff about amending and implementing IEPs and

3  documenting and reporting aversive interventions. (Dkt. No. 90-8 at 31-32.) OSPI further

4  ordered the District to review its current practices to determine whether they needed revision.

5  (Dkt. No. 90-8 at 32.) When the District failed to timely take the corrective action, OSPI

6  threatened to revoke its federal funding under the Individuals with Disabilities Education Act

7  (IDEA). (Dkt. No. 90-8 at 35-36.) The District ultimately complied.

8      On December 23, 2014, Miller filed the present suit on behalf of herself and as I.M.'s

9  guardian. (Dkt. No. 1 at 1.) She alleged multiple causes of action against the District, the Board,

10  Hart, Kinney, Dmochowsky, Cole, Hoover, and the individual Board members, including

11  violations of 42 U.S.C. § 1983, violations of the Americans with Disabilities Act and § 504 of

12  the Rehabilitation Act, violations of the Washington Law Against Discrimination, retaliation,

13  outrage, battery, assault, and negligence. (Dkt. No. 1 at 1.)

14      Presently before the Court are the motions for summary judgment by all Defendants

15  seeking to dismiss all claims. (Dkt. Nos. 65, 73.)

16  **II.   DISCUSSION**

17      **A.   Summary Judgment Standard**

18      The Court shall grant summary judgment if the moving party shows that there is no

19  genuine dispute as to any material fact and that the moving party is entitled to judgment as a

20  matter of law. Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the

21  facts and justifiable inferences to be drawn therefrom in the light most favorable to the

22  nonmoving party. *Anderson*, 477 U.S. at 255. Once a motion for summary judgment is properly

23  made and supported, the opposing party must present specific facts showing that there is a

24  genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

25  475 U.S. 574, 587 (1986). Material facts are those that may affect the outcome of the case, and a

26  dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to

return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248-49. Ultimately, summary

judgment is appropriate against a party who "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**B.      Section 1983 Claims Against All Defendants: 14th Amendment,
          4th Amendment, ADA/Section 504**

Plaintiff brings three claims under 42 U.S.C. § 1983 against all Defendants. She bases the

claims on the Fourteenth Amendment, the Fourth Amendment, and the Americans with

Disabilities Act (ADA) and § 504 of the Rehabilitation Act. (Dkt. No. 1 at 32, 37, 38.) All three

claims stem from the aversive interventions performed by Hart and Kinney allegedly in violation

of I.M.'s Plans. (*See* Dkt. No. 1 at 34-38.)

1.    Standard for § 1983 Claims

To establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that 1) the

defendant acted under color of state law and 2) the defendant deprived the plaintiff of a right

secured by the Constitution or laws of the United States. *Learned v. City of Bellevue,* 860 F.2d

928, 933 (9th Cir. 1988). Section 1983 liability arises only upon a showing of a defendant's

personal participation. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). However, a supervisor

is liable for the constitutional violations of subordinates "if the supervisor participated in or

directed the violations, or knew of the violations and failed to act to prevent them." *Id.* A

governing body can be sued under § 1983 only where the challenged action "implements or

executes a policy statement, ordinance, regulation, or decision officially adopted and

promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S.

658, 690 (1978).

Defendants assert that they are entitled to qualified immunity against all three § 1983

claims, because the aversive interventions did not violate any clearly established right. (Dkt. No.

73 at 22-23.) The doctrine of qualified immunity acts as a bar against § 1983 claims insofar as

the government official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). "If the plaintiff cannot meet this burden, the inquiry ends and defendants are entitled to summary judgment." *Sepatis v. City and County of San Francisco*, 217 F.Supp.2d 992, 997 (N.D. Cal. 2002). It will not suffice to merely articulate a broad constitutional right. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Id.*

2.   <u>Section 1983 Claims Against Individual Board Members</u>

Plaintiff has failed to show that the individual Board members can be held liable under § 1983 for the actions taken by Hart in September 2013 and by Kinney in November 2013. First, it is the Board's policy that the individual members do not have authority except when delegated by the Board. (Dkt. No. 80-5 at 2.) Plaintiff alleges no facts to suggest that any individual Board member took any individual action, whether delegated or not. Rather, she states that the Board, as an entity, "had actual notice of the facts surrounding the Chain Lake interventions [and] took no action whatsoever to ensure that the matter was fully investigated." (Dkt. No. 89 at 17.) Setting aside the issue of whether it was the Board's duty to do so, this omits any legal or factual basis on which to hold *individual members* liable.[1] Defendants' motion to dismiss Plaintiff's § 1983 claims against the individual Board members is GRANTED.

---

[1] Moreover, members Cheesman and Hutchinson did not join the Board until after the Salem Woods incidents, making it impossible for them to have any individual liability for Hart's or Kinney's actions. (*See* Dkt. No. 68 at 1; Dkt. No. 69 at 1.)

3.   <u>Section 1983 Claims Against Remaining Defendants</u>

Regarding her claims against the remaining Defendants, Plaintiff alleges only broadly that the aversive interventions violated I.M.'s due process rights under the Fourteenth Amendment, his Fourth Amendment right against unreasonable seizures, and his rights under the ADA and § 504 against disability-based discrimination. (Dkt. No. 1 at 34-39; Dkt. No. 10 at 11.) She articulates no more specific right applicable here.[2] (*See* Dkt. No. 89 at 8.) The Supreme Court has made clear that this is insufficient to demonstrate a clearly established right. *See al-Kidd,* 131 S. Ct. at 2084. Plaintiff does not meet her burden on summary judgment to defeat Defendants' claim of qualified immunity.

Moreover, the authority cited by Defendants suggests that there is no clearly established right at play here. For example, students have a clearly established right to be free from arbitrary and excessive corporal punishment. *See, e.g.*, *Preschooler II v. Clark County School Board of Trustees*, 479 F.3d 1175, 1181-82 (9th Cir. 2007); *P.B. v. Koch*, 96 F.3d 1298, 1302-03 (9th Cir. 1996). In *Preschooler*, the defendant was not entitled to qualified immunity after she "force[d] a seriously disabled four year old child to beat himself" and violently threw and slammed him. 479 F.3d at 1182. Likewise, in *Koch*, the court rejected the defense of qualified immunity where the defendant punched, slapped, grabbed, and slammed a student into a locker. 96 F.3d at 1304. Plaintiff presents no evidence that such excessive violence took place here.

Rather, Plaintiff alleges that the holds and seclusions—which, if conducted properly, were permitted under I.M.'s AIP—were performed for discriminatory reasons, by a teacher without the proper training, and for lengths that exceeded the maximum time limit in I.M.'s Plans. While the Court certainly does not condone such actions, Plaintiff has not shown that I.M. had a clearly established right against them. Nor has the Ninth Circuit evinced a willingness to find such a right. *See Payne v. Peninsula Sch. Dist.*, 623 Fed.Appx. 846 (9th Cir. 2015) (finding

---

[2] In fact, in her response on summary judgment, Plaintiff does not even address her § 1983 claim under the ADA/§ 504. (*See* Dkt. No. 89 at 8-9, 25.)

qualified immunity applied where teacher placed autistic student in prolonged seclusions as a

punishment and had student assist in cleaning up after he defecated in the seclusion room).

Defendants' motion is GRANTED as to Plaintiff's § 1983 claims.

**C.      Disability Discrimination Claims Against Board & District: ADA/§ 504**

Plaintiff alleges that the Board and the District violated the ADA and § 504 by denying

I.M. participation in and the benefits of a public education. (Dkt. No. 1 at 39.) Plaintiff asserts

that I.M. was subjected to force because of disability-related behavior that the District deemed

inappropriate or dangerous. (Dkt. No. 89 at 25.) Defendants argue that Plaintiff has no evidence

to support her discrimination claims and that, instead, the District and the Board made

extraordinary efforts to work with Plaintiff for I.M.'s education. (Dkt. No. 73 at 36-37.) Plaintiff

responds that, if the jury finds that I.M.'s treatment was in violation of his plans, it could infer

that the force used was because of I.M.'s behavior. (Dkt. No. 89 at 25.)

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides: "No otherwise

qualified handicapped individual in the United States . . . shall, solely by reason of his handicap,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. The

Court analyzes claims under the ADA and § 504 of the Rehabilitation Act together, because

there is no significant difference in the analysis of rights and obligations created by the two Acts.

*Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999). To recover

damages under the Acts, a plaintiff must prove intentional discrimination. *Duvall v. County of

Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). In determining whether intentional discrimination

occurred, the Ninth Circuit applies the "deliberate indifference" standard. *Id.* The plaintiff's

disability must be the reason for the discrimination. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794.

ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 13

1    Plaintiff has presented evidence of the following: I.M.'s autism caused him to be

2    disruptive and aggressive and, after he demonstrated such behavior, he was placed in seclusion.

3    The seclusions happened frequently and in favor of the less severe crisis management strategies

4    that were to be employed when I.M. exhibited unsafe behavior. Due to the use of seclusions, I.M.

5    grew increasingly anxious and fearful and had to be removed from school. Miller sought to

6    remedy the situation by repeatedly notifying Cole and Hoover of her concerns. The District and

7    the Board were aware of the aversive interventions performed at Chain Lake through Miller's

8    submission of materials to Hoover, who served as Secretary of the Board. When I.M. started at

9    Salem Woods, he was immediately subjected to more aversive interventions. The District and the

10   Board took no action to ensure that the aversive interventions were conducted properly.

11   Although Defendants staunchly dispute this version of the facts, on summary judgment

12   the Court must view the facts in the light most favorable to Plaintiff. With that standard in mind,

13   a reasonable juror could conclude that I.M. was subjected to intentional discrimination on the

14   basis of his disability. It is for the jury to decide whether the District's and Board's failure to

15   intervene constituted deliberate indifference. *See Oviatt By and Through Waugh v. Pearce*, 954

16   F.2d 1470, 1478 (9th Cir. 1992) ("Whether a local government entity has displayed a policy of

17   deliberate indifference is generally a question for the jury.").

18   Defendants' motion is DENIED as to Plaintiff's disability discrimination claims under

19   the ADA and § 504.

20       **D.    Disability Discrimination Claim Against All Defendants: WLAD**

21   Plaintiff alleges that all Defendants denied I.M. his right under Washington law to the full

22   enjoyment of all public school privileges without discrimination. (Dkt. No. 1 at 40.) She asserts

23   that I.M. was "subjected to force because of behavior that the District deemed inappropriate or

24   dangerous" and that "such behavior is a result of I.M.'s disability." (Dkt. No. 89 at 25.)

25   Defendants argue that Plaintiff has no evidence to support the claim that the aversive

26   interventions were used to punish I.M. for disability-related behavior. (Dkt. No. 73 at 44.)

ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 14

The Washington Law Against Discrimination (WLAD), Revised Code of Washington chapter 49.60 RCW, declares as a civil right the right to be free from discrimination because of membership in certain protected classes, including sensory, mental, or physical disability. Wash. Rev. Code § 49.60.030(1). The statute provides a civil cause of action allowing injunctive relief or recovery of damages and reasonable attorney fees. Wash. Rev. Code § 49.60.030(2).

"To make a prima facie case of public accommodation discrimination under the WLAD, a plaintiff must demonstrate: (1) that he has a disability; (2) that the defendant's place of business is a public accommodation; (3) that the defendant discriminated against the plaintiff by providing treatment not comparable to the level of services provided to individuals without disabilities; and (4) that the disability was a substantial factor causing the discrimination." *Wash. St. Commc'n Access Project v. Regal Cinemas, Inc.*, 293 F.3d 413, 421 (Wash. Ct. App. 2013).

Here, it is clear that I.M. is disabled and that the schools were public accommodations. *See* Wash. Rev. Code 49.60.040(2). The remaining questions are (1) whether discrimination occurred, *i.e.*, whether I.M. received inferior treatment compared to students without disabilities, and (2) whether I.M.'s autism was a substantial factor causing the discrimination.

As a preliminary matter, Plaintiff has pleaded no facts and provided no evidence to suggest that the individual Board members took any independent action apart from the Board as a unit. The WLAD claims against the individual Board members are DISMISSED.

Regarding the remaining Defendants, as discussed above, Plaintiff presented evidence that I.M. was frequently placed in seclusion as a result of his autism-related behavior; that the frequent seclusions caused I.M. to become anxious and fearful to the extent that he had to be removed from school; and that the District and the Board failed to ensure that aversive interventions were properly performed. A jury could conclude from this evidence that I.M. suffered a violation of his rights under WLAD.

It is unclear how liability is assessed under WLAD in the context of education discrimination. For example, can individual teachers be held liable for their actions, or is the

District solely responsible as the governing entity? Defendants cite only the standard for liability in the employment discrimination context. (Dkt. No. 73 at 3-4.) The Court is not persuaded that that standard is appropriate here. Defendants have not shown as a matter of law that they cannot be held liable under WLAD. The motion by Defendants District, Board, and individual District employees is DENIED as to Plaintiff's WLAD claims.

> **E.    Retaliation Claims Against Board, District, Cole, Hoover, and Individual Board Members: ADA, § 504, WLAD**

Plaintiff alleges that the Board, the District, Cole, Hoover, and the individual Board members took retaliatory actions against her in response to her pursuing I.M.'s rights under the IDEA. (Dkt. No. 1 at 41.) The specific acts Plaintiff alleges are as follows: instituting a truancy action against her; refusing to honor the findings of the OSPI decision; refusing to resolve the issues presented in the due process hearing unless Plaintiff dropped the claims in this case; conditioning I.M.'s attendance on Plaintiff's agreement to an expanded AIP with more liberal use of aversive interventions; denying that it had an obligation to fund private placement; and denying Plaintiff the benefit of counsel at an IEP meeting.[3] (Dkt. No. 1 at 41-42.) Defendants argue that each action had a nondiscriminatory reason and that Plaintiff has not demonstrated that those reasons are merely pretense. (*See* Dkt. No. 73 at 38-43.)

The ADA, the Rehabilitation Act, and WLAD all prohibit retaliation against a person asserting a claim based on a perceived violation of the anti-discrimination provisions. 42 U.S.C. § 12203; 34 C.F.R. § 100.7(e); Wash. Rev. Code § 49.60.210. Absent direct evidence of retaliation, the *McDonnell-Douglas*[4] burden-shifting framework used for proving Title VII discrimination claims applies. *Corrales v. Moreno Valley Unified Sch. Dist.*, 2010 WL 2384599

---

[3] Plaintiff also alleged that Defendants engaged in delay tactics in the due processing proceeding, resulting in a decision 106 days after the regulatory deadline. (Dkt. No. 1 at 42.) This Court has already rejected that argument and will not consider it further. (*See* C15-1323, Dkt. No 41 at 6.)

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

(E.D. Cal June 10, 2010). First, the plaintiff must establish a prima facie case of retaliation by showing that (1) he or she engaged in a protected activity; (2) he or she suffered a materially adverse action; and (3) there existed a causal connection between the protected activity and the adverse action. *See Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003). If the plaintiff does so, the defendant must provide evidence of a legitimate, non-retaliatory reason for the adverse action. *Id.* To survive summary judgment, the plaintiff must then produce specific, substantial evidence that the proffered reason is pretextual. *Id.*; *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

Again, Plaintiff has pleaded no facts and provided no evidence to suggest that the individual Board members took any independent action apart from the Board as a unit. The retaliation claims against the individual Board members are DISMISSED.

Regarding the claims against the remaining Defendants, Plaintiff has failed to meet her burden under the *McDonnell-Douglas* framework. In their motion for summary judgment, Defendants proffered legitimate reasons for each of the alleged retaliatory actions. (*See* Dkt. No. 73 at 39-43.) In response, Plaintiff stated only that "the acrimonious conduct of the District is in retaliation of Miller's efforts to enforce her rights and those of I.M." and that "all remaining issues are for the jury." (Dkt. No. 89 at 25-26.) This does not even come close to meeting Plaintiff's burden to show an issue of material fact as to pretext.

Defendants' motions are GRANTED as to Plaintiff's retaliation claims.

### F.   State Tort Claims Against All Defendants: Assault, Battery, Outrage, Negligence

Plaintiff raises four state tort claims against all Defendants: assault, battery, outrage, and negligence. (Dkt. No. 1 at 42-45.) Defendants argue that there is no evidence to support any of Plaintiff's state law tort claims. (Dkt. No. 73 at 44.)

Again, as discussed above, Plaintiff has pleaded no facts and provided no evidence to show that the individual Board members were involved in any alleged violation or had an

individual supervisory role over any other Defendant. There is nothing upon which a jury could

conclude that the individual Board members were liable for any of Plaintiff's intentional tort

claims. Regarding the negligence claim, Plaintiff has not established a duty on the part of the

individual Board members. Plaintiff cites only the fact that the Board members take an oath to

faithfully discharge their duties. (Dkt. No. 89 at 16.) But, Board policy provides that the Board is

a "legislative unit with no one member having authority except when delegated by the Board."

(Dkt. No. 80-5 at 2.) Nothing here suggests that any individual authority or duty arose at any

time. Plaintiff's state tort claims are DISMISSED as to the individual Board members.

### 1. Assault and Battery

Plaintiff asserts that the holds and escorts conducted by Hart and Kinney constituted

assault and battery.[5] (Dkt. No. 1 at 43-44.) Battery is a "harmful or offensive contact with a

person, resulting from an act intended to cause the plaintiff or a third person to suffer such a

contact, or apprehension that such a contact is imminent." *McKinney v. City of Tukwila*, 13 P.3d

631, 641 (Wash. Ct. App. 2000). Assault is any act of such a nature that causes apprehension of

battery. *Id.*

Plaintiff presented evidence that Hart performed holds and escorts without being properly

trained to engage in that type of physical contact with an autistic child. In addition, Plaintiff

presented evidence that the holds and escorts by both Hart and Kinney were performed with a

frequency that caused harm to I.M. and in favor of other techniques that were less invasive and

upsetting to him. Defendants dispute that Hart's and Kinney's conduct was tortious, arguing

instead that "[a]ll of this was use of educational tools to deal with the violent and aggressive

behavior of a student in accordance with an educational plan." (Dkt. No. 73 at 45.) Given the

dispute over the nature of the aversive interventions, there is a genuine issue of material fact as to

---

[5] Plaintiff's complaint also alleges that Dmochowsky participated in the holds and
escorts. (Dkt. No. 1 at 43-44.) But, Plaintiff does not point to any evidence showing that
Dmochowsky did anything more than review Kinney's behavior. (*See* Dkt. No. 90-3 at 13-16.)

1  whether they rose to the level of battery or assault.

2      Plaintiff asserts that the remaining Defendants are liable for Hart's and Kinney's actions.

3  (Dkt. No. 1 at 43-44.) When a federal court considers claims under state law, it applies federal

4  procedural law and state substantive law. *Mason and Dixon Intermodal, Inc. v. Lapmaster Intern.*

5  *LLC,* 632 F.3d 1056, 1060 (9th Cir. 2011); *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Thus,

6  the federal "supervisory liability" principle articulated in *Preschooler II* is not pertinent here.

7  Rather, Washington law on respondeat superior applies.

8      The general respondeat superior rule is that "the master is liable for the acts of his servant

9  committed within the scope or course of his employment." *Dickinson v. Edwards*, 716 P.2d 814,

10  819 (Wash. 1986) (internal quotation omitted). Whether an employee was acting within the

11  scope of his or her employment is a question of fact. *Id.* "An employee's conduct will be outside

12  the scope of employment if it is different in kind from that authorized, far beyond the authorized

13  time or space limits, or too little actuated by a purpose to serve the master." *Robel v. Roundup*

14  *Corp.*, 59 P.3d 611, 621 (Wash. 2002). "The proper inquiry is whether the employee was

15  fulfilling his or her job functions at the time he or she engaged in the injurious conduct." *Id.*

16  Respondeat superior applies only where there is an employer-employee relationship. *See*

17  *Breedlove v. Stout*, 14 P.3d 897, 899 (Wash. Ct. App. 2001). The question is whether there was

18  proof of control, or "whether the master accepted and controlled the service that led to the

19  injury." *Brown v. Labor Ready Northwest, Inc.*, 54 P.3d 166, 170 (Wash. Ct. App. 2002).

20      Defendants' motion implies that they do not believe Hart and Kinney performed the

21  holds and escorts in the course and scope of their employment. (*See* Dkt. No. 73 at 46.) This

22  position is inconsistent with their insistence that Hart and Kinney—I.M.'s teachers—merely used

23  educational tools pursuant to an approved educational plan. (See Dkt. No. 73 at 45-46.) As

24  discussed above, the nature of Hart's and Kinney's conduct is a disputed question of fact for the

25  jury; by the same token, there is a question of fact as to whether their conduct was within the

26  scope or course of their employment. As for the employer-employee relationship requirement,

there is insufficient evidence at this stage to conclude that, as a matter of law, any of the remaining Defendants did or did not have such a relationship with Hart or Kinney.

The motion by Defendants District, Board, and individual District employees is DENIED as to Plaintiff's battery and assault claims.

### 2.   Outrage

Plaintiff alleges that Defendants' acts and omissions constituted outrage. (Dkt. No. 1 at 43.) The tort of outrage has three elements: 1) extreme and outrageous conduct; 2) intentional or reckless infliction of emotional distress; and 3) severe emotional distress suffered by the plaintiff. *Kloepfel v. Bokor*, 66 P.3d 630, 632 (2003). The question of whether the defendant's conduct is sufficiently outrageous is ordinarily for the jury. *Dicomes v. State*, 782 P.2d 1002, 1013 (Wash. 1989). Plaintiff has presented evidence that I.M. was subjected to physical force and repeated seclusions, after which he returned home with feces in his pants and a deep fear of returning to school. While there is certainly a dispute as to whether the aversive interventions were carried out in such an offensive manner, it is for the jury to decide whether the conduct was sufficiently outrageous.

The motion by Defendants District, Board, and individual District employees is DENIED as to Plaintiff's outrage claims.

### 3.   Negligence

To establish a cause of action for negligence, a plaintiff must demonstrate that (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) damages resulted, and (4) the defendant's breach proximately caused the damages. *Tincani v. Inland Empire Zoological Soc'y*, 875 P.2d 621, 624 (Wash. 1994). The question of whether the defendant owes a duty to the plaintiff is a question of law. *Fuentes v. Port of Seattle*, 82 P.3d 1175, 1177 (Wash. Ct. App. 2003). Breach and proximate causation are normally left for the finder of fact. *Id.*

The precise duty owed by each Defendant has not been identified at this point and will certainly need to be articulated at trial. Nonetheless, the Court does not believe there is a serious

ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT
PAGE - 20

1  dispute as to whether school officials and entities owe some duty of care to students, especially

2  those who are particularly vulnerable. Indeed, Defendants do not dispute that a duty was owed to

3  I.M. (*See* Dkt. No. 73 at 46.) Rather, they argue that there was no evidence that any Defendant

4  breached a duty of care. (Dkt. No. 73 at 46.) Plaintiff presented evidence that aversive

5  interventions were performed in violation of I.M.'s Plans and caused him physical and

6  psychological harm, even after those in a supervisory role were aware of the potential harm.

7  Thus, based on the facts viewed in a light most favorable to Miller, there is a dispute of material

8  fact as to whether the remaining Defendants treated I.M. with the appropriate level of care.

9        The motion by Defendants District, Board, and individual District employees is DENIED

10  as to Plaintiff's negligence claims.

11  **III.   CONCLUSION**

12        For the foregoing reasons, the motion for summary judgment by the individual Board

13  member Defendants (Dkt. No. 65) is GRANTED in full. The motion for summary judgment by

14  the District, Board, and individual District employees (Dkt. No. 73) is GRANTED in part and

15  DENIED in part. The motion is GRANTED as to Plaintiff's § 1983 claims and retaliation claims.

16  The motion is DENIED as to Plaintiff's disability discrimination claims under the ADA/§ 504

17  and WLAD and state tort claims.

18        DATED this 3rd day of February 2016.

19

20

21

22

23

24

25

26

John C. Coughenour
UNITED STATES DISTRICT JUDGE